We have three cases on the calendar this morning. A case from the Patent, Trial and Appeal Board and one from the Court of Appeals for Veterans Affairs. The latter will be argued on the briefs, submitted only on the briefs and not argued. First case is Choctaw Transportation Company v. Department of Agriculture, 2017-16-17. Mr. Willis. Yes, Your Honor. Your Honor, my name is Matt Willis. I'm here on behalf of the appellant, Choctaw Transportation Company. As the court has already noted, this matter is on appeal from the Civilian Board of Contract Appeals. To be frank with the court, the opinion here is one in which the judge imposed a higher legal standard of proof upon the appellant than is required by law or is appropriate. If I'm going to be even more direct, it appears that the judge determined the outcome which he favored and then built backwards a decision to support that outcome. In particular, I can point out there was irrefuted testimony at trial as to both the appellant's means and methods of operation and their intended methods of performance prior to modification number one to the contract. In particular, the appellant intended to bring rock and materials down the Mississippi River out into the Gulf of Mexico, place rock into a formation which was called for by the contract. Isn't this case about a differing site condition which you didn't show? Yes, Your Honor. Yes, this case is about a differing site condition. In particular, as I was about to say, place rock behind a feature on the contract called the groin, a large revetment of rock coming out from the tip of the island. And behind that feature of work, behind the groin, there was a hump, an underground hump, which was not shown in the contract plans and specifications. It wasn't shown in the original as-bid plans and specifications. It also was not shown in the modification number one plans and specifications. Actually, I'm sorry, Your Honor, it was shown in modification number one, but modification number one was put out after two hurricanes had impacted the Gulf of Mexico, and it wasn't put out as a change to the contract to change a feature of the work, do something differently, add or subtract. Didn't your people inspect the site, and didn't the contract indicate that there'd be changing conditions, changing water levels? Wasn't all of this built in? Your Honor, I interpret two questions out of that one. The first is, did my client inspect the site? Yes, as well as they could from the top of the water. However, they could not, well, I suppose they were allowed, but it would be financially and practically impaired to actually conduct a full hydrological survey or bathymetric survey as to the condition of the seafloor. So, yes, they went to the site. They did see it. They did, in general, understand the area in which they were bidding work. But did they have their own bathymetric survey done to give them the topography of the area? No. They had to rely on the government specifications for that, which are, as a matter of law, supposed to be accurate. As to were they told that the conditions were, the word that has been used over and over again is dynamic, ever-changing. Yes, Your Honor, but that is not, in fact, applicable to the claim. Yes, water levels go up and down everywhere, the Gulf, the Mississippi River, the pond near my house. But the seafloor itself, yes, changes some. In this case, however, this hump was a semi-permanent feature or perhaps a permanent feature. In other words, when we obtained the real data that was actually available to the government prior to the issuance of the solicitation, it showed the hump. When we compared it with the data that was shown after the surveys after the hurricanes, hump's still there. So this is not a matter of where there is sand or accretion filling in or going away. It's not a matter of the water level going up and down. We're talking about an underwater ridge which prevented the appellant's intended means and methods of performance that was there before, during, and after. When the government issued Modification 1, did the government request a new price proposal with Modification 1? I believe they did, Your Honor. Okay, and then your side came back with a new schedule for performance but didn't come back with an adjustment to the price. That is correct, Your Honor. That is correct, Your Honor. That wasn't provided until after contract performance had been completed. So I'm just curious why after seeing in Mod 1 this notice about a hump and then other adjustments being made, you came back with a new proposal on the construction schedule but you didn't come back with any proposal on changing the price. Your Honor, respectfully, I don't know that we came back with a proposal on the construction schedule or a proposal on the plan. The request for the pricing was made contemporaneous with a notice to proceed. In other words, we weren't asked how much is it going to cost to do Modification 1? Are you still going to be able to proceed? We were told get to work. And I believe the testimony at trial was that they got the notice to proceed and they went to work. And perhaps they should have provided a requested price adjustment or price proposal at some point thereafter before the completion of the work. But nonetheless, that didn't obviate their obligation to go to work as directed at that same time. So it's not as if they were asked how much is this going to cost and then the government decide whether or not they were going to still move forward with the work. My client was directed to proceed. I guess what I'm wondering is if your client had this subjective plan to use the original plan dimensions of the groin to do the construction and assumption that there was no hump behind that groin area. And then all of a sudden, now in this Modification 1, there's all this new information about changes to the proposed plan. It would seem like if you did have that subjective plan, then that's when you would have alerted the government. Okay, now that you've made these sorts of adjustments to the plan, that impacts how we're planning on doing the construction. And so therefore, not only is it going to take longer, but it's actually going to cost the government more. Your Honor, in hindsight, I wish they had done that. But, Your Honor, I think they were under the notice to proceed. They did clearly give notice of the differing site condition. They did give notice that they were impacted. What they didn't give notice of was an amount of money that it was going to take to perform the work in light of the new modifications. And also, Your Honor— At what point did it give notice to the government that now they were, I don't know, impacted by Modification 1? Your Honor, when they gave notice of the differing site condition. They didn't necessarily go into how the means and methods were impacted directly, but they did give notice of the differing site condition, which accompanying is our work has to change. When did they do that? I don't have the date in front of me, Your Honor, but it was shortly after the mobilization notice to proceed. They were advised of the differing site condition. And, Your Honor, I also have to point out that as the testimony at trial, one of the reasons why this was not pursued more aggressively as a change or more aggressively explaining the means and methods is the appellant was told that these changes were due to the hurricane. They were told these were not changes that the government has made to the contract. They were changes that were caused by an act of God, and this is kind of your FYI as to what you're about to encounter. Not this is actually corrections made to the contract, which, you know, corrected mistakes in the bid and solicitation documents. And so the appellant was presented with a situation where they had a notice to proceed on a contract, which they believe was modified based on the government's representations, incorrect representations, by hurricanes, which were an act of God and a non-compensable alteration of the proceedings. And I'd point out that there's no testimony in the record, there's no evidence in the record, there's no indication in the record except for two points raised by the, of course, the government in its brief and the board in its decision, which would refute the appellant's plan. The first is that Mr. Zelenka and Mr. Ford had a different opinion as to the amount of barges that could have been fleeted behind the groin. One was four to six, one was six to eight. As we pointed out in our reply brief, if they were in collusion, it would have been the same number, not two different numbers. That doesn't go to a discrepancy in the testimony as to its inaccuracy. In fact, it bolsters the fact that that's what they intended to do or else they would have come up with the same number. And the lack of contemporaneous documentation, there's no contemporaneous documentation as to the intended means and methods of performance. Either way. Yes, but the burden was on you. Your Honor, it was. By a preponderance of the evidence, the burden was on the appellant to prove, well, first, what they, a reasonable interpretation of the contract and what they actually found was materially different and the impact to their means and methods, but they did that, Your Honor. When the board said that they did not because they didn't have contemporaneous evidence, there is no indication to prove to the board by a preponderance of the evidence that you have to have contemporaneous documentation at the time. Well, how are we supposed to interpret the contract in a way that necessarily requires the groin to be a certain length because it allows you to more efficiently do the construction? I don't see anything in the contract that says that. And then, of course, as I understood the board decision, it said there was no contemporaneous evidence to support that kind of theory and understanding of that both parties had a meeting of the minds of the contract in that particular way. Well, two points, Your Honor. The first is a meeting of the minds. No, I'm sure the government didn't know how the appellant intended to pursue the work, and there's no contradiction that the appellant intended to do it exactly as it was testified to under oath in open court with no contrary information or representations. So why is it part of the contract? Your Honor, it's not that a protected area behind the groin was specified as available specifically by the contractor. In other words, they didn't draw out a rectangle and say fleeting area for barges. What they did was gave them the work limits, gave them the bathymetric topography of the area, and say, here's what we want you to build. Build it here. Now, when they did that, it is open to the contractor to use that available area in such a way as they see fit and appropriate to build the job. So while, no, there's not a box drawn on the contract plans that say fleeting area, because the appellant reviewed the plans and specifications, saw that the groin was going to create a protected area and that the draft area behind the groin would be sufficient but for the shortening of the groin in Mod 1, and especially the hump, to use that for a fleeting area, that was a reasonable interpretation of how to use the work area. No, the government didn't say, here's your fleeting area. But the contractor had, you know, full opportunity to make use of the work limits as they saw fit. That was an appropriate and respectable use of that area to fleet barges, to have materials on site to better service the rest of the work. Mr. Wells, you're into your rebuttal time. You can continue to use it or save it. I was about to say, I'm into it. If there's not another question at this moment, I'd like to save what I have. Then we'll save it. Ms. Kirshner. May it please the court. The court should affirm because the board correctly decided the only legal issue, which is interpretation of the contract, and its findings of fact are supported by substantial evidence. There was only a single claim for damages based on alternative theories, either under the changes clause, differing site condition, or a defective specification. At the board, Choctaw contended that the water bottom elevations north of the area where it says it was going to have the fleeting area, that that was a differing site condition. Regarding that contention, the board found, based on contemporaneous job records and I point out, what we had here was three sets of contemporaneous job records. The government's records, Choctaw's records, and the subcontractor's records. Based on all of those contemporaneous records, the board found that from January to February of 2006, when they're starting work, what's happening is that the work is being impacted by severe weather and changing water depths. The board finds that this is the dynamic environment that the contract foretold. And what is happening is, as the board said, it is clear that the water depths were changing during contract performance as areas that were accessible at first became unaccessible within a short period of time. It points out that within a two-week period, from January to then into February of 2006, the area right behind where they're building the beginning of the groin is filling in with sand. And the board points out in its decision that this area, which had been six feet in depth, where you could get in a barge that drafts six feet, has now filled in. And these findings are pages 22, 23, 53, and 57 of the joint appendix. As I understand Choctaw's argument, they're saying that the sand hump was always there at the time of the original solicitation. And so, therefore, it's inaccurate for the government to suggest as a basis for Mod 1 that the sandbar was due to an act of God, but instead it was due to an oversight by the government when the government originally issued the solicitation. That is indeed their argument. With respect to that argument, what the board did is first, on the differing site condition claim, look at what was happening at the site. And there it found that in these contemporaneous job records, there's no mention of this sandbar hump as impacting the job, or even any mention of it at all. What the job records talk about is building the beginning of the groin, the most eastern end, and that area immediately filling in with sand right behind the groin so that their work is impacted and they leave the job. Can you look with me please at page 44 and 45, or J45 and 46 of the appendix? I believe I'm looking at the board's opinion, is that right? J45 and 46? Yes. And aren't these fact findings by the board on page JA45 and 46 that the modification 1, in particular the position of the groin, was erroneously, according to the government's own personnel, erroneously alleged to be the result of hurricanes, but in fact was not the result of hurricanes, but rather the government's own initial errors in the survey? Isn't that what the board expressly finds on pages 44 and 45 of its opinion? Yes. So what am I missing? I thought you were suggesting that this was the result of hurricanes, and I thought the board expressly found it wasn't. No, we are not arguing that these modification... to have been a changed site condition due to the hurricanes, which would have been within the contracting dynamic conditions that could have been reasonably foreseeable. But in fact, it turns out that the board found it was not a result of the hurricane, and it was a result of the government's original surveying errors. So why ought there not to be compensation then for a change in conditions in light of the government's erroneous original survey and then the subsequent modification? The board addressed exactly the court's point. What the board pointed out is that the case should be analyzed under the changes clause, and it assumed that the change in the length of the groin was a change, and also that the hump, which appears in the drawings with the modification, is a change. And then it looked to see whether there would be entitlement under the changes clause. And what the board pointed out in its opinion is when you examine... it asked, first of all, do these changes impact the work? And the answer was no. It was no because the board looked at all these contemporaneous job records, and the contemporaneous job records never asserted at any point that the length of the groin was impacting the work or that this... Didn't the contracting officer request a price proposal and the appellant didn't submit it? Yes, that's correct. The change order itself is on page 13... And they proceeded with the work. Is it? They proceeded with the work. Yes, they did. But the change order itself is at page 1324 of the appendix. It was a notice to proceed plus a request for a change proposal. Whether you need additional time, whether you need additional costs, give us your proposal. And this change order included all of the revised drawings, and this was issued in December before any of the work was begun. And as the board found, this change order was absolutely clear. If you looked at it, you could see that the groin was 926 feet. So you knew right away that there's a shortening of the groin. Yet there's no mention in any document of that change in the groin in its length or its coordinates as impacting the work. Also, the board found that the sandbar hump was clearly shown in these revised drawings. But there's no mention of the sandbar hump impacting the work in any of the contemporaneous records, any of these daily reports. There's also no mention in any of the correspondence that goes back and forth between the contractor... natural conditions of this particular environment that led to the increased costs on the contractor, rather than the changes made in Mod 1. Is that right? Yes, that's right. And then at the same time, is it an alternative ground for rejecting the equitable adjustment claim that the contractor failed to propose a new price proposal in response to Mod 1? Or are those two sort of lumped together? I would say they're lumped together, to be fair to the board's opinion. The board looks at the whole body of evidence and concludes that if there really was a plan for a fleeting area north of the groin, it would have come up at some point. You would have talked about it. You would have written about it. It would have been in your daily reports. Somewhere, sometime, you would have said something about it. But there's no mention of it anywhere. And what the board points out is the claim. There's only one claim. And what the claim really is based upon is that there was supposed to be a fleeting area. A fleeting area north of the groin where you would have eight barges, and they would be filled with rock throughout the job, and that's your store's place so you can do your work quicker because the rock is right there. That's how the claim was presented. And what the board found is that that was an unreasonable interpretation of the contract, and that's the only legal issue in the case, really. Everything else is factual. And what the board did is point out that based on the provisions of the contract, it was unreasonable to assume that you could have this fleeting area. These barges, if they're half-filled, they draft six feet, meaning that that area has to be at least six feet deep throughout the whole job to have these barges in that area. And that was an unreasonable assumption. The board pointed to language on the drawings. These are on the drawings of the groin and on the breakwaters where it says, quote, bottom elevations may change due to the dynamics of the environment. It also pointed to Special Provision 8, which warns of tidal fluctuations in the water depths, and it points to the construction specifications, which say that access to the sites may be impeded due to shallow water conditions. And the board found that it was unreasonable to rely on one drawing which had certain contours on it and assume that that would be good for July 2005 when the solicitation was issued or throughout the performance of the job. The surveys that are noted in the original specifications are from 2003 and 2004. The board also cited to the personal experience of the subcontractor who had built the earlier breakwaters, and there that contractor, the subcontractor, had experienced these changing water depths. As breakwaters are built, areas behind them fill in with sand. And that is exactly what happened on this job, as the board found. The court raised certain questions. I just wanted to address those. There was a question about notice. The only notice that was given in this case was oral. There was an oral complaint on January 25, 2006, which is noted in the board's opinion at the joint appendix, page 22. And the complaint is about access to the job site. There was an access route in. And the complaint is that that access route in has filled in since the hurricanes, and so you can't get your barges in along that access route. And what I'll point out, and the board finds it's an opinion, is that there are no depths noted on the plans for the access route. So there's no differing site condition for the access route. There's never any real claim for the access route into the job site. But what the government does is waive the work limits. You can't get in the way the plan's indicated. Well, you can access the groin otherwise. The other question. Okay, I think I've covered the court's other questions. In terms of the site visit, I wanted to address that a little bit more. Here, the testimony about the site visit that they conducted was that they went along the area of the groin in July of 2005, and this is before the hurricanes and also before they put in their bid. And they went with a meter, and they tested the depths of the water. And based on their site visit, they came up with their bid. And the board finds that that is evidence that is contrary to the notion that they should be entitled to a change, an equitable adjustment based on the changes in the modification. Basically, to sum up, the expert testimony is rejected because it was based on a unreasonable interpretation of the contract. It was also based on a completion date that the expert arrived at. Basically, the whole claim itself is based on this alternative universe where the water depths are static, and there's always a place for a fleeting area with eight barges north of the groin. If the court has no further questions, we would ask that the decision be affirmed. Thank you, Ms. Bishop. Mr. Willis has three and a half minutes if you need it. Yes, Your Honor. Please, the court, again, I simply will not have time to address all the issues that were raised in my brief, but please don't feel that by not raising one of them I've waived any. I'd like to point out a couple of things. Number one, this case can be looked at as a changes clause matter, but it is more appropriately viewed as a differing site condition because the modification, number one, to the contract, yes, it quote-unquote made changes to the contract, but it was provided to the appellant as an FYI as to what they were going to encounter, not to any real changes that were made to the work to be performed. The hump was shown. It was always there. It's not as if they had added that feature of work or that difficulty behind the groin. The hump was always there. The length of the groin, the length of the groin always went from the tip of the island to breakwater zero. On the plans and specifications which were bid, they provided an incorrect length of the groin. Modification number one, they corrected the length of the groin. They didn't say we've now told you to build a shorter groin. They always intended for the groin to be built to the length to which it was built. In the plans and specifications as bid upon, however, they were indicating that the groin would be longer. So that is not a change that was made to the contract. That is a correction that was made. It would be a differing site condition that was found. It was not represented correctly in the contract and then encountered by the contractor upon mobilization of the site. Your Honor, I'd also like to point out briefly, Mr. Canole's work was not based upon a faulty reading of the contract nor an alternative universe in which water depths were static. No one has ever indicated that the water depths were not dynamic. No one has ever indicated that there would not be some accretion or silting away of material around the breakwaters around the groin. It's part of the purpose of the features. However, the feature that impacted performance the most as hump was always there. This plan to develop a fleeting area behind the groin was, based on the bid and specifications and what was actually bid upon by the appellant, an allowable use of the work limits. It is not something that they were told they had to do, nor were they told that they could, but they weren't prevented by any means from doing it. That's how they reasonably decided to pursue the work. Mr. Canole based his decisions on the fact that that was a reasonable use of the work limits and the plan and methods of performance. His methodology was called into question, but legally, as we've pointed out in our brief, there is no problem with his methodology. It was not a total cost analysis, and the fact that he later, in rebuttal, performed a total cost analysis and that it showed similar results. Can you just quickly explain? I understand you have a theory for why this was a materially different site condition, but can you explain why the board's analysis lacked substantial evidence, what the board relied on to conclude that it wasn't the changes in Maguan, but instead it was weather and the dynamic water conditions of the environment? Why were they unreasonable in concluding what they concluded? They were unreasonable in concluding that the plan and means of operation was not what was intended by the appellant. Yes, the board is correct that there were changes. There's always going to be weather in the Gulf. There's always going to be high and low tides in the Gulf. However, even Mr. Pinal's work took into account those severe weather days and took them out of any damages calculation. The board was unreasonable in its determination because the fact of the matter is that hump and the changes that were corrected, not made by modification number one, exacerbated every other condition out there, including the tides, including the weather. And when you're talking about the protection that they were going to get from the groin, the fact that severe weather impacted them, it did. It impacted them a heck of a lot more than if they'd had the protection they should have had. Thank you, counsel. We will take the case on the submission. Be excused, Your Honor.